**JANE L., et al., Plaintiffs,**

v.

**Norman BANGERTER,
et al., Defendants.**

**Civ. No. 91–C–345G.**

United States District Court,
D. Utah, C.D.

Dec. 17, 1992.

Janet Benshoof, Rachael Pine, Eve Gartner, New York City, Jeffrey Oritt, Howard Lundgren, Salt Lake City, UT, and Simon Heller, New York City, for plaintiffs.

Mary Anne Wood, Anthony Quinn, James Soper, Paul Durham and Kay Balmforth, Salt Lake City, UT, for defendants.

## MEMORANDUM DECISION AND ORDER III–IN RE PORTIONS OF MOTION FOR SUMMARY JUDGMENT

J. THOMAS GREENE, District Judge.

This matter came regularly before the Court on April 10, 1992, on defendants' Motion for Summary Judgment. Plaintiffs were represented by Janet Benshoof, Rachel Pine, Eve Gartner, Jeffrey Oritt, Howard Lundgren and Simon Heller. Mary Anne Wood, Anthony Quinn, James Soper, Paul Durham and Kay Balmforth appeared for defendants. Extensive oral argument was heard, after which bench rulings were rendered and later supplemented as to several issues,[1] and the Court took certain other issues under advisement pending resolution by the Supreme Court of *Planned Parenthood v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). After that case was decided on June 29, 1992, the parties were permitted to file further memoranda concerning the impact of *Casey* upon the matters under advisement.

Now being fully advised, the Court enters its Memorandum Decision and Order.

## STATUTORY BACKGROUND

During the 1990 General Session of the Utah legislature, three bills to restrict abortion were introduced.[2] The legislature did not formally consider these bills, but decided to study the issue further. To this end, the legislature adopted a resolution, HJR 39, "Abortion Limitation Resolution," stating that the policy of the legislature was to favor childbirth over abortion and to restrict abortion to the extent the Constitution would permit. This resolution established the "Abortion Task Force Committee," composed of fourteen members of the Utah House and Senate. The Task Force committee held a series of hearings throughout the spring and summer of 1990. Experts in the fields of medicine, law, philosophy, public policy, and political science were invited to testify and to submit data relating to possible abortion legislation. In addition, the Task Force conducted nine public hearings throughout the state in order to elicit public comment on various legislative options concerning abortion. Following these hearings, Senate Bill No. 23, entitled "An Act Relating to Abortion; Prohibiting Abortion Except Under Specified Circumstances," was sponsored by Sen. McAllister, debated and passed within

---

1. The bench rulings were memorialized in orders issued April 10, 1992 and supplemented along with other rulings in two Memorandum Decisions. *Jane L. v. Bangerter,* 794 F.Supp. 1528 (D.Utah 1992); *Jane L. v. Bangerter,* 794 F.Supp. 1537 (D.Utah 1992).

2. House Bill 446, House Bill 171 and Senate Bill 270. *See* Journal of the House of Representatives of the State of Utah, Forty–Eighth Legislature, 1990 General Session at 146, 654; State of Utah, Senate Journal, 1990 General Session of the Forty–Eighth Legislature at 605.

four days, and signed into law by the Governor of Utah on January 25, 1991.

On April 4, 1991, plaintiffs in this action filed a complaint for declaratory judgment and injunctive relief against enforcement of portions of the new and existing Utah Abortion Acts. Shortly thereafter, Senate Bill 23 was amended by Senate Bill 4,[3] and adopted by the Utah legislature in a four hour special session held on April 17, 1991. On May 15, 1991, plaintiffs filed an eight count Amended Complaint seeking invalidation of the entire new Act, and invalidation of certain sections of the Utah Abortion Act of 1974. This Court enjoined enforcement of the challenged provisions of the Utah Abortion Acts pending determination of the merits of this litigation.

An extensive record was developed and filed with the Court presenting legislative and historical facts relating to abortions, pregnancies and the Utah statutes in which the liberty interest of women in making the choice to have an abortion is balanced against the state's interest in protecting unborn children. Professional and expert opinions, statistics, social and economic data, and information concerning medical health, religious, family and psychological impacts were set forth in depositions, written summaries, exhibits and other documents all of which were verified and lodged with the Court.

The Utah statutes which were taken under advisement after extensive argument on defendants' Motion for Summary Judgment are as follows:

76-7-302. *Circumstances under which abortion authorized.*

(1) An abortion may be performed in this state only by a physician licensed to practice medicine under the Utah Medical Practice Act or an osteopathic physician licensed to practice medicine under the Utah Osteopathic Medicine Licensing Act and, if performed 90 days or more after

the commencement of the pregnancy as defined by competent medical practices, it shall be performed in a hospital.

(2) An abortion may be performed in this state only under the following circumstances:

(a) in the professional judgment of the pregnant woman's attending physician, the abortion is necessary to save the pregnant woman's life;

(b) the pregnancy is the result of rape or rape of a child, as defined by Section 76-5-402 and 76-5-402.1, that was reported to a law enforcement agency prior to the abortion;

(c) the pregnancy is the result of incest, as defined by Subsection 76-5-406(10) or Section 76-7-102, and the incident was reported to a law enforcement agency prior to the abortion;

(d) in the professional judgment of the pregnant woman's attending physician, to prevent grave damage to the pregnant woman's medical health; or

(e) in the professional judgment of the pregnant woman's attending physician, to prevent the birth of a child that would be born with grave defects.

(3) After 20 weeks gestational age, measured from the date of conception, an abortion may be performed only for those purposes and circumstances described in Subsections (2)(a), (d) and (e).

(4) The name of a victim reported pursuant to Subsection (b) or (c) is confidential and may not be revealed by law enforcement or any other party except upon approval of the victim. This subsection does not effect or supersede parental notification requirements otherwise provided by law.

76-7-304. *Considerations by physician—Notice to minor's parents or guardian or married woman's husband.*

To enable the physician to exercise his best medical judgment, he shall:

**3.** Among other things, Senate Bill No. 4 expressly eliminated criminal liability for the woman obtaining an abortion, amended the rape and incest reporting requirements, changed the wording in sections 76-7-307 and -308 from "serious and permanent" damage to "grave" damage, and added the requirement that only "intentional" performance of an unauthorized abortion would result in criminal penalties.

(1) Consider all factors relevant to the well-being of the woman upon whom the abortion is to be performed including, but not limited to,

(a) her physical, emotional and psychological health and safety,

(b) her age,

(c) her familial situation.

(2) Notify, if possible, the parents or guardian of the woman upon whom the abortion is to be performed, if she is a minor or the husband of the woman, if she is married.

**76–7–307.** *Medical procedure required to save life of unborn child.*

If an abortion is performed when the unborn child is sufficiently developed to have any reasonable possibility of survival outside its mother's womb, the medical procedure used must be that which, in the best medical judgment of the physician will give the unborn child the best chance of survival. No medical procedure designed to kill or injure that unborn child may be used unless necessary, in the opinion of the woman's physician, to prevent grave damage to her medical health.

**76–7–308.** *Medical skills required to preserve the life of unborn child.*

Consistent with the purpose of saving the life of the woman or preventing grave damage to the woman's medical health, the physician performing the abortion must use all of his medical skills to attempt to promote, preserve and maintain the life of any unborn child sufficiently developed to have any reasonable possibility of survival outside of the mother's womb.

**76–7–315.** *Exceptions to certain requirements in serious medical emergency:*

When due to a serious medical emergency, time does not permit compliance with Section 76–7–302, Subsection 76–7–304(2) or Subsection 76–7–305(2), the provisions of those sections do not apply.

## BACKGROUND FACTS

The following non-adjudicative, legislative or undisputed facts[4] pertinent to certain matters under advisement support the rulings made herein:

* Utah has kept some of the most meticulous, complete, and accurate abortion statistics in the nation. Brockert Test. ¶¶ 5, 10–11.

* The duration of a pregnancy can be measured from the last menstrual period (LMP) or from conception. Calculation of conception age begins 2 weeks later than LMP. *See, e.g.,* F. Gary Cunningham, Paul C. MacDonald and Norman F. Gant, *Williams Obstetrics* at 87 (18th ed. 1989). (Defs.' Supp.Mem. of 10/4/92 Ex. B.)

* The Utah legislature calculated gestation age "measured from the date of conception...." Utah Code Ann. § 76–7–302(3) (Supp.1991).

* The statutory cut-off for non-therapeutic abortions is *after* 20 weeks, which is 21 weeks from the date of conception or 23 weeks LMP. Utah Code Ann. § 76–7–302(3) (Supp.1991).

* Survival as early as 21 weeks gestational age (23 weeks LMP) is possible. *Williams Obstetrics, supra,* note 1, at 747–48.

* At twenty weeks gestational age, the unborn child is fully developed and is simply maturing in the womb. *See* Defs.' Trial Ex. A. By twenty weeks gestational age, even the eyelids, eyebrows and fingernails of the unborn child are well developed. DeVore Summ. at 13.

* Based on the record before this Court, there has never been a non-therapeutic abortion performed in the State of Utah after 20 weeks gestational age. Defs.' Trial Ex. G–T.

* If a viable child is aborted and survives, it almost always suffers impairment as a result of prematurity. *Williams Obstetrics supra* note 1, at 747–48.

* The Utah Women's Clinic, since 1989, performed abortions on only three fetuses after nineteen weeks gestational age, all

4. *See* discussion in *Jane L. v. Bangerter,* 794 F.Supp. 1537, 1540–1541 (D.Utah 1992).

for severe abnormalities. Pls.' Mem.Opp'n Defs' Mot.Summ. J. Porter Decl. at 2.

\* The principal abortionist in the State of Utah, Dr. Madhuri Shah of the Utah Women's Clinic, does not do abortions after 20 weeks gestational age because of the difficulties they pose for herself and her patients. Shah Dep. at 71: 12–21.

\* Dilatation and extraction ("D and E") is the safest form of interruption of pregnancy in the second trimester, but it is a technique that requires skilled physicians who perform this procedure on a regular basis. While a number of physicians throughout the United States perform D and E's up through 22 weeks of gestation, there are only a handful of individuals with expertise beyond 22 weeks. Because of the expertise required, this is not a common procedure performed after 22 weeks in the majority of cities throughout the United States. DeVore Summ. at 33.

\* Few physicians are willing to perform late term D and E procedures because the fetus is torn into bits and pieces. *Id.*

\* The more common practice is vaginal delivery through induction of labor. *Id.* at 34.

\* After 22 to 24 weeks gestational period, the difference in the mortality rate between vaginal delivery and D & E is insignificant. DeVore Dep. at 16–17.

The Utah statutes will now be analyzed to determine whether they pass muster in the light of the Supreme Court's ruling in *Planned Parenthood v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

## ANALYSIS

### 1. *Pre–Viability Abortions*

■ Defendants have conceded that the Utah statutory ban on abortions, at least as it relates to non-therapeutic abortions prior to viability of the fetus, "appears to be

unconstitutional"[5] under the guidelines established by the Joint Opinion in *Planned Parenthood v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).[6] In that case, a majority of the Supreme Court reaffirmed the "essential holding" of *Roe v. Wade* in all of its three parts, as follows:

> First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger a woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.

*Id.* at ——, 112 S.Ct. at 2804. The first part of the reaffirmed *Roe* opinion controls the decision here rendered as to pre-viability abortions. Manifestly, the outright ban (with certain statutory exceptions) as mandated by the Utah statute on abortions by demand prior to the 21 week gestation age would constitute departure from "the essence of Roe's original decision," affirmed by the dicta of the majority in *Casey.*

As the Court noted in *Casey,* judges do not have the right or obligation to "mandate our own moral code." *Id.* at ——, 112 S.Ct. at 2806. Accordingly, this Court holds that Utah Code Ann. § 76–7–302(2) (Supp.1991) insofar as it relates to pre-viability abortions before 21 weeks gestational age constitutes an unconstitutional infringement on a woman's liberty interest under the Due Process Clause of the Fourteenth Amendment.[7]

---

**5.** Defendants' Supplemental Reply Brief dated September 14, 1992, at 2.

**6.** The Joint Opinion was authored by Justices O'Connor, Kennedy and Souter. Justices Stevens and Blackmun concurred in recognizing the right of women to choose abortion before

viability free from any undue burden imposed by the state.

**7.** In *Sojourner T. v. Edwards,* 974 F.2d 27 (5th Cir.1992), the Fifth Circuit struck down a Louisiana statute banning abortions except to pre-

## 2. Post–Viability Abortions

In a separate section of the 1991 abortion statute, the Utah Legislature adopted the period "after 20 weeks gestational age" (23 weeks LMP) as the point beyond which abortions could not be performed, except to protect the mother's life, to prevent grave damage to maternal health or to prevent grave birth defects. Utah Code Ann. § 76–7–302(3).

### a. Severability of § 76–7–302(3)

■ Plaintiffs have urged that because *Casey* invalidates section 76–7–302(2), and because section 76–7–302(3) incorporates part of the invalidated statute (subsections 2(a), (d) and (e)), section 76–7–302(3) must also be struck down as unconstitutional. This argument lacks merit. Subsections (a), (d) and (e) have only been invalidated by this Court as they relate to the ban on pre-viability abortions in section 76–7–302(2). In any event, those subsections are a part of section 76–7–302(3) as to post-viability abortions by reference and stand independent of the provisions of Utah Code Ann. 76–7–302(2) as to pre-viability abortions. Under section 76–7–302(3), the subsections constitute the "purposes and circumstances" under which post-viability abortions may be performed.

The Utah legislature enacted a severability clause relative to the abortion statute which would preserve every "provision, section, subsection, sentence, clause, phrase or word" not declared unconstitu-

tional.[8] The Utah Supreme Court has held that a section of a statute may be severed from an invalidated statute if "the remaining portions of the act can stand alone and serve a legitimate purpose." *Berry v. Beech Aircraft*, 717 P.2d 670, 686 (Utah 1985). *Accord, Utah Technology Finance Corp. v. Wilkinson*, 723 P.2d 406, 414 (Utah 1986). In this case the post-viability requirements are entirely separate from the pre-viability requirements, and can stand alone. As for the requirement that subsection 76–7–302(3) serve a legitimate purpose, the Supreme Court recognized in *Roe* that a state can prohibit abortion after viability as long as there are exceptions, as there are here, "when it is necessary to preserve the life or health of the mother." *Roe v. Wade*, 410 U.S. 113, 164, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973).

### b. Facial Challenge

■ The well-established rule of the Supreme Court concerning facial challenges has application here: "[A] facial challenge must be rejected unless there exists no set of circumstances in which the statute can be constitutionally applied." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).[9] This rule was not applied as such by the majority of the Supreme Court in *Casey*. Instead, it seems that in some contexts the majority, *sub silentio*, abandoned the traditional facial challenge approach in favor of an undue burden standard.[10] It is

---

serve the life or health of an unborn baby, remove a dead child, save the life of the mother, or when the pregnancy is the result of rape or incest, and certain reporting requirements are met. The Louisiana statute prohibited all abortions, so as written it was declared to be facially unconstitutional. The court did not address the distinction between pre-viable and post-viable fetuses which comes into play under the Utah statute.

**8.** Utah Code Ann. § 76–7–317 provides:

If any one or more provision, section, subsection, sentence, clause, phrase or word of this part or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be severable and the balance of this part shall remain effective notwithstanding such unconstitutionality. The legislature hereby declares that it

would have passed this part, and each provision, section, subsection, sentence, clause, phrase or word thereof, irrespective of the fact that any one or more provision, section, subsection, sentence, clause, phrase, or word be declared unconstitutional.

**9.** *See* discussion of facial challenge in the context of Utah's "serious medical emergency" statute, *infra* at 877–878.

**10.** In the context of Pennsylvania's 24 hour waiting period statute, the Court appears to have combined facial challenge analysis with the undue burden test. However, with regard to the spousal notification statute, the Court did not determine whether the law had *any* constitutional applications as *Salerno* requires. The Court stated instead that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the

therefore unclear whether the majority would refuse to apply traditional facial challenge analysis to all pre-viability, non-therapeutic abortions.[11] It appears to this Court that such analysis has forceful application in late abortions at or near the viability line.

Justice Scalia pointed out in connection with the Supreme Court's recent refusal to grant certiorari in *Ada v. Guam Society of Obstetricians & Gynecologists*, —— U.S. ——, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992), that *Casey* did not alter such facial challenge analysis, and said:

> Facial invalidation based on overbreadth impermissibly interferes with the state process of refining and limiting-through judicial decision or enforcement discretion-statutes that cannot be constitutionally applied in all cases covered by their language. And it prevents the State (or territory) from punishing people who violate a prohibition that is, in the context in which it is applied, entirely constitutional.

*Id.* at ——, 113 S.Ct. at 634. While this observation was made in dissent, joined by the Chief Justice and Justice White, it reiterates the familiar rule of law which continues to be binding upon lower courts.

It is clear that the Utah statute can be applied constitutionally in the vast majority of cases. This is because the Utah statutory prohibition of abortions at 21 weeks gestational age corresponds with the time when the unborn child is capable of independent existence, being fully developed and simply maturing in the womb. As to such fetal life, the statute amply withstands a facial challenge. To strike it down based upon an implausible scenario of abortions of unviable fetuses after 20 weeks[12] would require this Court impermissibly to resort to the doctrine of "overbreadth." The Supreme Court has consistently refused to apply the doctrine of over-

breadth beyond the First Amendment context. *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (citations omitted). *See also, Rust v. Sullivan*, —— U.S. ——, ——, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991).

#### c. Viability

The Court in *Casey* fixed the point of viability as a fair and appropriate line of demarcation wherein the interest of the State in unborn children exceeds the liberty interest of a woman in the abortion choice. In this regard, the majority in *Casey* declared that "viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a *legislative ban* on non-therapeutic abortions," —— U.S. at ——, 112 S.Ct. at 2811 (emphasis added), and that viability constitutes the point at which "there is a *realistic possibility* of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection...." *Id.* at ——, 112 S.Ct. at 2817 (emphasis added).

A compelling reason set forth in *Casey* to uphold limitations or *restrictions* on post-viability abortions is that by then a woman may fairly be deemed to have consented to the exercise of the state's interest in protection of life. The three authors of the Joint Opinion said in this regard:

> The viability line also has, as a practical matter, an element of fairness. In some broad sense it might be said that a woman who fails to act before viability has consented to the State's intervention on behalf of the developing child.

*Id.* at ——, 112 S.Ct. at 2817.

In establishing the viability line, the court in *Casey* rejected the "rigid trimester framework of *Roe v. Wade.*" *Id.* ——, 112 S.Ct. at 2821. Dicta set forth in cases which derived from the trimester frame-

law is irrelevant." *Casey*, —— U.S. at ——, 112 S.Ct. at 2829. *See* discussion at note 27.

**11.** The Court in *Casey* observed that, "[a] finding of undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the

path of a woman seeking an abortion of a *nonviable fetus.*" *Casey*, —— U.S. at ——, 112 S.Ct. at 2820 (emphasis added).

**12.** Based on the record before the Court, there have been no cases of non-therapeutic abortions after 20 weeks in Utah.

work would seem to invalidate Utah's line of demarcation based upon gestational age.[13] However, in a more recent case the Supreme Court upheld a Missouri statute[14] which "create[d] what is essentially a presumption of viability at 20 weeks." *Webster v. Reproductive Health Service,* 492 U.S. 490, 515, 109 S.Ct. 3040, 3055, 106 L.Ed.2d 410 (1989).[15] The statute in *Webster* was upheld in an opinion by the Chief Justice, joined by Justices White and Kennedy, because it was "reasonably designed to ensure that abortions are not performed when the fetus is viable." 492 U.S. at 520, 109 S.Ct. at 3058. Justice O'Connor concurred in the judgment as to this part (II–D) of the opinion, stating, "all nine members of the *Thornburgh* Court appear to have agreed that it is not constitutionally impermissible for the State to enact regulations designed to protect the State's interest in potential life *when viability is possible.*" *Id.* at 528, 109 S.Ct. at 3062 (emphasis added). Justice Scalia also concurred in the judgment.

The Utah statute was reasonably designed to take effect at a time when life outside the womb is possible. In this regard, the gestational age line drawn in the Utah statute corresponds with the time of possible fetal survival. The Court in *Casey* observed that given the advances in neonatal care since the era of *Roe,* viability may now be reached at "23 to 24 weeks," —— U.S. at ——, 112 S.Ct. at 2811. This is the equivalent of 21 to 22 weeks gestational age (23 to 24 weeks LMP) as defined in the Utah statute.[16]

#### d. Undue Burden

On the record before the Court, non-therapeutic abortions after the 20 week gestational period are not performed and have never been performed in Utah. Moreover, plaintiffs have submitted no evidence that any woman wants or has attempted to obtain such a late non-therapeutic abortion, and doctors generally avoid the trauma of such late abortions because of risks and difficulties to the woman and fetus. Therefore, under the *Casey* rationale, the statutory provision is not "likely to prevent a significant number of women from obtaining an abortion," nor can it be found that "for many women, it will impose a substantial obstacle." *Id.* at ——, 112 S.Ct. at 2829. Twenty weeks certainly constitutes fair notice to the woman of the abortion ban to be imposed, and her consent to abide by the ban except for health reasons fairly can be implied.

Based upon the foregoing, and on the record presented, it seems clear that Utah's prohibition of such late, non-therapeutic abortions does not impose an undue burden

---

**13.** In *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court stated, "it is not the proper function of the legislature or the courts to place viability ... at a specific point in the gestation period." In *Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), the Court reiterated this position and stated,

> Because this point may differ with each pregnancy, neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor—as the determinant of when the State has a compelling interest in the life or health of the fetus.

*Id.* at 388–89, 99 S.Ct. at 682.

**14.** The statute in *Webster* provided in relevant part:

> Before a physician performs an abortion on a woman he has reason to believe is carrying an unborn child of twenty or more weeks gesta-

tional age, the physician shall first determine if the unborn child is viable....

Mo.Rev.Stat. § 188.029 (1986).

**15.** In *Webster,* Chief Justice Rehnquist referred to previous trimester-based cases and said,

> We think the doubt cast upon the Missouri statute by these cases is not so much a flaw in the statute as it is a reflection of the fact that the rigid trimester analysis of the course of a pregnancy enunciated in *Roe* has resulted in subsequent cases like *Colautti* and *Akron* [*v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687] making constitutional law in this area a virtual Procrustean bed.

*Id.* at 517, 109 S.Ct. at 3056. In *Casey,* a majority of the Supreme Court joined in abandoning the trimester framework. —— U.S. at ——, 112 S.Ct. at 2808. *See* discussion at 874–875, *infra.*

**16.** The Utah prohibition takes effect "*after* 20 weeks gestational age," which at the earliest would be 21 weeks gestational age. Utah Code Ann. § 76–7–302(3) (Supp.1991).

on a woman's liberty interest, whether the fetus is non-viable or viable after the 20 week period.[17]

### 3. Standards Physicians are Required to Follow When Aborting a Potentially Viable Fetus

Two provisions [18] in the Utah law require that the medical procedure and the medical skills used in a post-viability abortion must be calculated, in the "best medical judgment of the physician," [19] to give the unborn child the "best chance of survival," while at the same time preventing the pregnant woman's death or grave damage to her health.

■ Plaintiffs allege that these statutes are unconstitutional pursuant to the decision of the Supreme Court in *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986).[20] In that case, the Court held that a Pennsylvania statute was facially unconstitutional because it " 'require[d] the mother to bear an increased medical risk in order to save her viable

fetus.' " *Id.* at 769, 106 S.Ct. at 2183 (citing *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)). In *Colautti*, the Court did not actually rule such a trade-off to be unconstitutional, but the majority recognized "serious ethical and constitutional difficulties, that we do not address," in statutory language requiring a physician "to make a 'trade-off' between the woman's health and additional percentage points of fetal survival." *Colautti*, 439 U.S. at 400, 99 S.Ct. at 688. Although in purporting to follow *Colautti*, *Thornburgh*, appears to decide the issue, the case was called into question in the recent *Casey* opinion, and for reasons set forth hereinafter, this Court considers *Thornburgh* to be substantially undermined and not controlling to invalidate the Utah statute.[21]

Authors of the Joint Opinion in *Casey* discarded the trimester approach set forth in *Roe v. Wade* as unnecessary because "we do not consider [it] to be part of the essential holding of *Roe*." *Casey*, —— U.S. at ——, 112 S.Ct. at 2818.[22] The authors of

17. Plaintiffs have also challenged the requirement in section 76–7–302(3) that the fetus' life be favored except when necessary to prevent "grave damage" to the mother's health. They claim this is inconsistent with *Casey's* mandate that the woman's health not be "endangered." *Casey*, —— U.S. at ——, 112 S.Ct. at 2804. This Court has upheld the constitutionality of the use of "grave damage" in a similar context *infra*, at note 20. That analysis applies with equal force here.

18. Utah Code Ann. §§ 76–7–307 and –308. These provisions are set out in full *supra*.

19. In the exercise of "best medical judgment," the physician is required under the statute to "(1) Consider all factors relevant to the well-being of the woman upon whom the abortion is to be performed including, but not limited to, (a) her physical, emotional and psychological health and safety, (b) her age, (c) her familial situation." Utah Code Ann. § 76–7–304 (Supp. 1991).

20. Plaintiffs also argue that the statutes are unconstitutional because the language permitting abortion of a viable fetus in the case of "grave damage to the woman's health" conflicts with statements in *Roe* (reiterated in *Casey*) that the State can only regulate or proscribe abortions after viability "if the law contains exceptions for

pregnancies which *endanger* a woman's life or *health*." *Casey*, —— U.S. at ——, 112 S.Ct. at 2804 (emphasis added). The claim is that by the time the level of "grave damage" is reached, a woman's health would already be "endangered." However, the definition of "endanger," "to expose to danger or harm: imperil," Webster's II New Riverside University Dictionary 431 (1988), is not unlike the meaning of "grave" damage, "fraught with danger or harm." *Id.* at 546. The requirement in section 76–7–302(3) that the physician avoid "grave damage" to the woman's health is consistent with the Supreme Court's mandate that an exception be provided to permit abortion of a viable fetus if the woman's health is "endangered."

21. Only the Supreme Court can overrule one of its own precedents. *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535, 103 S.Ct. 1343, 1344, 75 L.Ed.2d 260 (1983). However, "if later Supreme Court decisions indicate to a high degree of probability that the Court would repudiate the prior ruling if given the opportunity, a lower court need not adhere to the precedent." *Levine v. Heffernan*, 864 F.2d 457 (7th Cir.1988) (citations omitted) (*cert. denied*, 493 U.S. 873, 110 S.Ct. 204, 107 L.Ed.2d 157 (1989)).

22. This part (Part IV) of the Joint Opinion commanded only a minority of three of the court,

the Joint Opinion also said, "The trimester framework suffers from these basic flaws: in its formulation it misconceives the nature of the pregnant woman's interest; and in practice it undervalues the State's interest in potential life, as recognized in *Roe*." *Id.*

As a result of the Court's decision in *Casey*, the "rigid constraint" set forth in the trimester framework is no longer the law of the land, and cases which have struck down abortion regulations on the basis of applying the trimester framework can no longer be regarded as controlling.[23] This is significant because, as noted in the Joint Opinion, "[m]ost of our cases since *Roe* have involved the application of rules derived from the trimester framework." *Id.* at ——, 112 S.Ct. at 2818 (citing *Thornburgh* and *Akron I*). The Court said that such cases cannot be reconciled with the holding of *Roe* itself "that the state has legitimate interests in the health of the woman and in protecting the potential life within her." *Id.* at ——, 112 S.Ct. at 2817.

 The practical effect of the rejection of the trimester framework is that states will now have much greater leeway to pass regulations that impinge to some degree upon the woman's right to non-therapeutic, pre-viability abortions.[24] In addition, these regulations will be upheld unless they constitute a "substantial obstacle" to the woman's right to choose to abort a nonviable fetus in view of the formal acceptance and delineation of the undue burden test. *Id.* at ——, 112 S.Ct. at 2820.[25] As the Third Circuit recently noted, "when a majority of the Justices announce in the course of deciding a case that

they are substituting a new standard or result for that used in a prior case, the substitution is effected, and the lower courts are thereafter bound to follow the new standard or result." *Planned Parenthood v. Casey*, 947 F.2d 682, 692 (3rd Cir. 1991). This Court therefore abandons strict scrutiny review as required in *Roe* in favor of the undue burden test as adopted in *Casey* relative to pre-viability, non-therapeutic abortions.

It appears to this Court that the greater importance set forth in *Casey* upon the State's interest in potential fetal life, and the corresponding decreased weight given to the woman's right to abortion, extend with even more force into the area of post-viability abortions where the State's interest in fetal life becomes compelling. Utah's post-viability abortion provisions square with the emphasis in *Casey* on the State's interest in viable fetal life. Further, a safety valve exists in the Utah statutory scheme in that in any abortion the physician is required to "consider all factors relevant to the well-being of the woman upon whom the abortion is to be performed."[26] The statutes in question only become operative "when the unborn child is sufficiently developed to have any *reasonable possibility* of survival outside its mother's womb" and require the physician to favor the survival of the fetus "consistent with the purpose of saving the life of the woman or preventing grave damage to her health."

Based upon the foregoing, this Court finds Utah Code Ann. §§ 76–7–307, 308 (Supp.1991) to be facially valid and to bear

but the four dissenting Justices concurred in the result of abandoning the trimester framework.

**23.** The authors of the Joint Opinion disapproved those parts of *Thornburgh* which are "inconsistent with *Roe*'s acknowledgement of an important interest in potential life...." *Casey*, —— U.S. at ——, 112 S.Ct. at 2823.

**24.** The Court in *Casey* declared,
A logical reading of the central holding in *Roe* itself, and a necessary reconciliation of the liberty of the woman and the interest of the State in promoting prenatal life, require, in our view, that we abandon the trimester framework as a rigid prohibition on all previ-

ability regulation aimed at the protection of fetal life.
—— U.S. at ——, 112 S.Ct. at 2818.

**25.** In *Thornburgh* and other post-*Roe*-pre-*Webster* cases, the woman's right to an abortion was regarded as fundamental, so very few abortion regulations survived strict scrutiny. In *Casey* the Court revised the woman's right to abortion from a virtually unassailable fundamental right subject to strict scrutiny review to a liberty interest subject to undue burden analysis.

**26.** Utah Code Ann. § 76–7–304(1). *See* discussion at 879.

a rational relationship to the legitimate state interest in preservation of viable fetal life.

### 4. Spousal Notification

■ The fourth provision of the Utah Abortion Act under consideration is section 76-7-304, the spousal notification requirement. A majority of the Supreme Court struck down a somewhat similar spousal notification requirement in *Casey*. The Pennsylvania statute at issue in that case mandated that a married woman desiring an abortion provide the physician with either a signed statement that she has notified her spouse that she intends to have an abortion, or a signed statement that her husband was not the one who impregnated her; that her husband could not be located; that the pregnancy is the result of spousal sexual assault which she has reported; or that the woman believes that notification will result in bodily injury. 18 Pa.Cons. Stat.Ann. § 3209 (1990).

The Utah statute provides that spousal notice be given by the pregnant woman's physician, rather than by herself. Also, the Utah statute requires notification to the husband "if possible." Defendants contend that the statute is facially valid

because it has been on the books for 18 years without any evidence that it has prevented any abortions[27], the physician and not the pregnant woman gives notice if such is to be given, and the statute contains a broad and expansive exception which requires notice only "if possible."

In this Court's opinion, the giving of notice by the woman's physician rather than by the woman constitutes a distinction without a difference. The same abuse from violent and dangerous husbands could be expected whether the notice comes from the woman or the woman's physician. As to the arguably broad "if possible" exception, the Utah Supreme Court interpreted the statute in effect to require notification not *only* if possible, but if at all possible.[28] *See H.L. v. Matheson,* 450 U.S. 398, 405, 101 S.Ct. 1164, 1169, 67 L.Ed.2d 388 (1981) (citing *H.L. v. Matheson,* 604 P.2d 907, 913 (Utah 1979)).

The Supreme Court analogized the Pennsylvania spousal notification requirement, despite its extensive exceptions, to the spousal consent requirement invalidated in *Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976).[29] The majority of the Supreme Court then adopted what appears to be an unequivocal position on

**27.** The Supreme Court in *Casey* approached the facial challenge of the Pennsylvania spousal notification statute in a way that seems to avoid the well-established requirement that the plaintiff "'show that no set of circumstances exists under which the [provision] would be valid.'" *Casey,* — U.S. at ——, 112 S.Ct. at 2870 (citation omitted). The Court conceded that the statute might affect "fewer than one percent of women seeking abortions." *Id.* at ——, 112 S.Ct. at 2829. However, the Court went on to state:

The analysis does not end with the one percent of women upon whom the statute operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects.... The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.... [I]n a large fraction of the cases in which § 3209 is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. It is an undue burden, and therefore invalid.

*Id.* at ——, 112 S.Ct. at 2829–30.

**28.** In *H.L. v. Matheson,* 604 P.2d 907, 913 (1979) the Utah Supreme Court said:

There is no ambiguity in the term "if possible" within the context of subsection (2); and, therefore, there is no basis to construe the term beyond its literal, plain meaning. The trial court's interpretation is consistent with the clearly expressed legislative intent, viz., the consulting physician must notify the parents, if under the circumstances, in the exercise of reasonable diligence, he can ascertain their identity and location and it is feasible or practicable to give them notification.

**29.** The statute in *Danforth* required prior written consent of the spouse of the woman seeking an abortion during the first 12 weeks of pregnancy, unless "the abortion is certified by a licensed physician to be necessary in order to preserve the life of the mother." *Danforth,* 428 U.S. at 67–68, 96 S.Ct. at 2840. The Court struck down this statute on the grounds that "we cannot hold that the State has the constitutional authority to give the spouse unilaterally the ability to prohibit the wife from terminating her pregnancy, when the State itself lacks that right." *Id.* at 70, 96 S.Ct. at 2841.

the unconstitutionality of spousal notification statutes, stating:

> The spousal notification requirement is likely to prevent a significant number of women from obtaining an abortion.... [I]t will impose a substantial obstacle. We must not blind ourselves to the fact that a significant number of women who fear for their health and safety as well as the safety of their children are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortions in all cases.

*Casey*, —— U.S. at ——, 112 S.Ct. at 2829. The same principles apply to the Utah statute.[30]

Conceivably, a spousal notification statute with appropriate exceptions could be found to be constitutional. However, that situation is not presented here.[31] In line with *Casey*, this Court holds section 76–7–304 to be an unconstitutional infringement upon the woman's liberty interest.

### 5. *Serious Medical Emergency*

■ The final provision at issue is the "serious medical emergency" statute. Utah Code Ann. § 76–7–315 (Supp.1991). When such an emergency exists, this statute excuses compliance with requirements otherwise mandated by the legislature, such as the notification requirements of subsection 76–7–304(2), and the consent requirements of subsection 76–7–305(2).[32]

#### a. Core Meaning

Plaintiffs have challenged this statute on grounds of unconstitutional vagueness. They claim that the term "serious medical emergency" is incapable of definition and that the absence of a mens rea provision creates potential criminal liability because of uncertainty as to whether the statute embodies an objective or a subjective standard of "serious medical emergency."

■ The test applied to statutes challenged for vagueness is whether "men of common intelligence must necessarily guess at its meaning and differ as to its application." *Baggett v. Bullitt*, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964). This test incorporates the requirements that notice be given to individuals of prohibited conduct, *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), and that sufficient guidance be given to enforcement officials to avoid "arbitrary and discriminatory enforcement." *Id.* With respect to these two concerns, the Court stated,

> Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized that the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine-the requirement that a legislature

**30.** In striking down the Pennsylvania spousal notification statute, the Supreme Court relied primarily on national information and statistics to "reinforce what common sense would suggest." *Casey*, —— U.S. at ——, 112 S.Ct. at 2828. This Court assumes that essentially the same information, statistics and common sense would apply to Utah.

**31.** If the Utah legislature had defined, or the Utah Court had construed, "if possible" expansively as the plaintiff urged in *H.L. v. Matheson*, that is, "as conferring on the consulting physician discretion to determine if medically, socially, psychologically, and physically, it would be appropriate to notify...." 604 P.2d at 912, the spousal notification statute might withstand constitutional challenge. As interpreted by the Utah Supreme Court in *Matheson*, however, the exception to notification set forth in the Utah law is less broad than in Pennsylvania.

**32.** Section 76–7–305(2) provides:

> (2) No consent obtained pursuant to the provisions of this section shall be considered voluntary and informed unless the attending physician has informed the woman upon whom the abortions is to be performed:
>
> (a) Of the names and addressed of two licensed adoption agencies in the state of Utah and the services that can be performed by those agencies, and nonagency adoption may be legally arranged; and
>
> (b) Of the details of development of unborn children and abortion procedures, including any foreseeable complications, risks, and the nature of the post-operative recuperation period; and
>
> (c) Of any other factors he deems relevant to a voluntary and informed consent.

Section 76–7–315 also excuses compliance with section 76–7–302, a portion of which (§ 76–7–302(2)) this Court strikes down as unconstitutional in this Memorandum Decision and Order.

establish minimal guidelines to govern law enforcement." Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."

*Id.* at 357–358, 103 S.Ct. at 1858 (quoting *Smith v. Goguen,* 415 U.S. 566, 574–575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974).

▆▆▆▆ In the context of a facial challenge [33] such as this, plaintiffs have a more difficult burden of proof. Plaintiffs must establish that the challenged law is "impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). In other words, that the law is "utterly devoid of a standard of conduct so that it 'simply has no core' and cannot be validly applied to any conduct." *High Ol' Times, Inc. v. Busbee,* 673 F.2d 1225, 1228 (11th Cir.1982). If persons of reasonable intelligence can determine a core meaning, "the enactment may validly be applied to conduct within that meaning and the possibility of a valid application precludes facial invalidity." *Id.* (quoting *Brache v. County of Westchester,* 658 F.2d 47, 51 (2nd Cir. 1981), *cert. denied,* 455 U.S. 1005, 102 S.Ct. 1643, 71 L.Ed.2d 874 (1982)).

With regard to the argument that the term "serious medical emergency" has no core meaning, it is apparent to the Court that physicians routinely are confronted with emergencies and as a part of their training can recognize them. In a prior Memorandum Decision and Order in this case, this Court followed Supreme Court precedent in finding a core meaning for such terms as "necessary to save a mother's life" and "grave damage to the woman's medical health," because definition of these terms is a "routine question for the professional judgment of the attending physician." *Jane L. v. Bangerter,* 794 F.Supp. 1537, 1542 (D.Utah 1992).

#### b. Mens Rea

In addition to the existence of a core meaning for the terms used in the Utah statute, whatever ambiguity inheres in the term "serious medical emergency" is cured by the presence of a mens rea statute which requires scienter on the part of the physician before criminal liability attaches. The Supreme Court has stated that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Flipside,* 455 U.S. at 499, 102 S.Ct. at 1193.[34]

The mens rea statute applicable to the serious medical emergency statute, section 76–7–314, requires intentional[35] perfor-

---

**33.** The Supreme Court has observed that " '[a] facial challenge ... is ... the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.' " *Rust v. Sullivan,* —— U.S. ——, ——, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991) (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

**34.** The Court cited a law review article for the proposition that not every scienter requirement will suffice to mitigate a law's vagueness:

> [I]t is evident that ... the scienter meant must be some other kind of scienter than that traditionally known to the common law-the knowing performance of an act with intent to bring about that thing, whatever it is, which the statute proscribes, knowledge of the fact that it is so proscribed being immaterial.... Such scienter would clarify nothing; a clarificatory "scienter" must envisage not only a knowing of what is done but a knowing that what is

done is unlawful or, at least, so "wrong" that it is probably unlawful.

*Flipside,* 455 U.S. at 499 n. 14, 102 S.Ct. at 1193 n. 14 (quoting Note, *The Void-for-Vagueness Doctrine in the Supreme Court,* 109 U.Pa.L.Rev. 67, 87 n. 98 (1960)).

**35.** By definition (section 76–7–301) as well as penalty (section 76–7–314), performance of an abortion in violation of the "serious medical emergency" statute would have to be "intentional":

> 76–7–301. Definitions.
> As used in this part:
> (1) "Abortion" means the *intentional termination* or attempted termination of human pregnancy....
> 76–7–314. Violations of abortion laws—Classifications.
> (1)(a) Any person who *intentionally performs an abortion* other than authorized by this part is guilty of a felony of the third degree.... (Emphasis added).

mance of an unauthorized[36] abortion before a person performing an abortion could be prosecuted. The Legislature of Utah imposed this scienter requirement so that a physician would intentionally have to abort a fetus when the physician knew that a serious medical emergency did not exist. In a similar context, the Third Circuit said:

> [T]he statute requires a physician to violate his or her own good faith clinical judgment in order to be criminally liable. This is a subjective, not an objective standard.... We fail to see how any physician practicing in good faith could fear conviction under the Act.

*Planned Parenthood v. Casey,* 947 F.2d 682, 702 (3rd Cir.1991). In the instant case, the subjective good faith judgment of an attending physician who perceives a "serious medical emergency" to exist would also constitute a defense to a criminal charge under the Act.

Plaintiffs cite *Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) in support of their proposition that the mens rea provision in section 76–7–315 is inadequate. In *Colautti,* the Supreme Court held (among other things) that section 5(a) of the Pennsylvania Abortion Control Act, 1974 Pa.Laws, Act No. 209, (Purdon 1977), was unconstitutionally vague and that the general mens rea requirement in section 2501, Pa.Stat.Ann., Tit. 18 (Purdon 1973 and Supp.1978), did not cure that vagueness.

The Utah mens rea statute differs from the Pennsylvania statute in one crucial respect. The required mental state under the Pennsylvania statute was "intentionally, knowingly, recklessly or negligently caus[ing] the death of another human being." § 2501 (1973). Therefore, as the Supreme Court noted, "the Pennsylvania law of criminal homicide requires scienter with respect to whether the physician's actions will result in the death of the fetus ... [but it does not require] that the physician be culpable in failing to find sufficient reason to believe that the fetus may be viable." *Colautti,* 439 U.S. at 394–395, 99 S.Ct. at 685. In contrast, the Utah statute conditions liability upon intentional abortion of a fetus when the physician knew that a serious medical emergency was not present. This type of mens rea requirement "relieves[s] the statute of the objection that it punishes without warning an offense of which the accused was unaware" and preserves section 76–7–315 from a vagueness challenge. *Screws v. United States,* 325 U.S. 91, 101–102, 65 S.Ct. 1031, 1035–1036, 89 L.Ed. 1495 (1945).

### c. Best Medical Judgment– Well Being of Woman

In addition to the existence of a mens rea provision requiring scienter, this Court reads section 76–7–304 (set out in full *supra*) to express the legislature's intent that the physician's "best medical judgment" must always be brought to bear upon any abortion-related decision. This section details some of the factors relevant to the well-being of the woman which the physician shall consider in the exercise of his or her best medical judgment, and does not limit the scope of these considerations to any particular circumstances. As noted in this Court's earlier memorandum decisions, the Supreme Court has upheld the constitutionality of statutes which permit the physician's best medical judgment to determine the necessity of abortion. *See e.g., United States v. Vuitch,* 402 U.S. 62, 69–70, 91 S.Ct. 1294, 1298, 28 L.Ed.2d 601 (1971) (statute permitting abortion when necessary in physician's judgment to preserve health of woman was not void for vagueness); *Doe v. Bolton,* 410 U.S. 179, 191–192, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973) (statute requiring determination of necessity of abortion based upon attending physician's best clinical judgment not void for vagueness).

As against a similar challenge to a "medical emergency" law, the District Court in *Casey* invalidated the statute finding that there were three serious conditions which

---

**36.** Utah Code Ann. § 76–7–314 imposes criminal liability upon any person "who intentionally performs an abortion other than *authorized....*" (Emphasis added). Abortions performed "when due to a serious medical emergency" are *authorized* under Utah Code Ann. 76–7–315.

would not be covered thereunder: preeclampsia, inevitable abortion, and prematurely ruptured membrane. *Planned Parenthood v. Casey,* 744 F.Supp. 1323, 1378 (E.D.Pa.1990). The Third Circuit reversed, and in rejecting the vagueness claim stated:

> [W]e read the medical emergency exception as intended by the Pennsylvania legislature to assure that compliance with its abortion regulations would not in any way pose a significant threat to the life or health of a woman. We believe it should be interpreted with that objective in mind. While the wording seems to us carefully chosen to prevent negligible risks to life or health or significant risks of only transient health problems from serving as an excuse for noncompliance, we decline to construe "serious" as intended to deny a woman the uniformly recommended treatment for a condition that can lead to death or permanent injury.

*Planned Parenthood v. Casey,* 947 F.2d 682, 701 (3rd Cir.1991). The Supreme Court affirmed the Court of Appeals and declared that its interpretation did not amount to "plain error," *Casey,* —— U.S. at ——, 112 S.Ct. at 2822 (citing *Palmer v. Hoffman,* 318 U.S. 109, 118; 63 S.Ct. 477, 482, 87 L.Ed. 645 (1943), *Brackett v. Spokane Arcades, Inc.,* 472 U.S. 491, 499–500, 105 S.Ct. 2794, 2799–2800, 86 L.Ed.2d 394 (1985) and *Frisby v. Schultz,* 487 U.S. 474, 482, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988)). A majority of the Court joined in the conclusion that the medical emergency definition "imposes no undue burden on a woman's abortion right." *Id.*

This Court reads the Utah medical emergency exception as intended by the Utah legislature to assure that compliance with its abortion regulation would not in any way pose a significant threat to the life or health of a woman, and interprets the phrase "serious medical emergency" to include the serious conditions which are not expressly covered by the statute. Further, since the professional clinical judgment of the physician necessarily is implicated in his or her intentional determination of the existence or non-existence of a "serious medical emergency," the absence of a specific provision embracing the physician's professional judgment is of little import. This Court holds that the Utah medical emergency statute provides the fair warning to physicians required by the Due Process Clause,' sets clear guidelines for enforcement officials, and is therefore not void for vagueness.

Based upon the foregoing, it is hereby

ORDERED, that Utah Code Ann. § 76–7–302(2) and Utah Code Ann. § 76–7–304 are declared to be unconstitutional under the United States Constitution. It is,

FURTHER ORDERED, that Utah Code Ann. §§ 76–67–302(3), 76–7–307, 76–7–308, and 76–7–315 are upheld as constitutional under the Constitution of the United States.

Counsel for defendants are directed to prepare and lodge with the Court a form of Judgment consistent with this opinion after first complying with local rule 206(b).