102 F.3d 1112
 65 USLW 2472, 97 CJ C.A.R. 4
 JANE L., on behalf of herself and all others similarly
situated; Utah Women's Clinic, P.C.; Planned Parenthood
Association of Utah; David Hansen, M.D.; Madhuri Shah,
M.D.; John Carey, M.D.; Dan Chichester, M.D.; Kirtly
Parker Jones, M.D.; Neil K. Kochenour, M.D.; Rhonda Lehr,
M.D.; Claire Leonard, M.D.; Kenneth Ward, M.D.; Bonnie
Jeanne Baty, M.D.; Susan Elizabeth Lyons, L.C.S.W.; Janet
Lynn Wolf, L.C.S.W.; Leslie McDonald-White, L.C.S.W.;
Reverend David Butler; Reverend Barbara Hamilton-Holway;
Reverend George H. Lower; Reverend Lyle D. Sellards;
Reverend Doctor Alan Condie Tull; Marie Soward Green;
Rabbi Frederick L. Wenger; Jane J. Freedom, (Pseudo-Name);
Julie Spouse, (Pseudo-Name); American College Of
Obstetricians and Gynecologists, Utah Sections; Penny
Thompson; Wendy Edwards, Plaintiffs-Appellants
v.
Norman H. BANGERTER, as Governor of the State of Utah; Paul
Van Dam, Attorney General, as Attorney General of
Utah, Defendants-Appellees.
 Nos. 93-4044, 93-4059.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 23, 1996.
 
 Janet Benshoof and Simon Heller of The Center for Reproductive Law & Policy, New York City; Jeffrey R. Oritt of the American Civil Liberties Union of Utah, Salt Lake City, UT; and A. Howard Lundgren of Bugden & Lundgren, Salt Lake City, UT, on the brief for Plaintiffs-Appellants.
 Carol Clawson, Utah Solicitor General, Jan Graham, Utah Attorney General, Jerrold S. Jensen, Utah Assistant Attorney General, and Brent A. Burnett, Utah Assistant Attorney General, Salt Lake City, UT, on the brief for Defendants-Appellees.
 Before SEYMOUR, Chief Judge, PORFILIO, Circuit Judge, and BROWN, Senior District Judge.*
 SEYMOUR, Chief Judge.
 
 
 1
 In Jane L. v. Bangerter, 61 F.3d 1493 (10th Cir.1995) (Jane L. IV ), this court considered the constitutionality of certain provisions of the Utah laws regulating abortions. The Utah statute setting out the circumstances under which an abortion was permitted contained one section regulating abortions occurring before twenty weeks gestational age, see Utah Code Ann. § 76-7-302(2) (1995), and one section regulating abortions after twenty weeks gestational age, see id. § 302(3). The district court had declared section 302(2) unconstitutional, see Jane L. v. Bangerter, 809 F.Supp. 865, 870 (D.Utah 1992) (Jane L. III ), and defendants did not challenge that ruling. Plaintiffs argued on appeal that section 302(3) was not severable from section 302(2), and that section 302(3) was therefore invalid along with section 302(2). In the alternative, plaintiffs contended that if section 302(3) were severable, it was nonetheless unconstitutional on its face. We determined as a matter of Utah law that the provisions were not severable and invalidated section 302(3) on that basis. See Jane L. IV, 61 F.3d at 1496-99. Accordingly, we did not address the constitutionality of section 302(3) standing alone. See id. at 1497 n. 3.
 
 
 2
 The Supreme Court granted certiorari and limited its review to our holding that the two provisions of the Utah statute were not severable. The Court summarily reversed the judgment as to that issue, and remanded the case to us for further proceedings. See Leavitt v. Jane L., --- U.S. ----, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) (per curiam). The only issue before us on remand is the one we did not previously reach:[1] the constitutionality of Utah's attempt to regulate abortions after twenty weeks gestational age as set out in section 302(3).[2]
 
 
 3
 Section 302(3) provides: "After 20 weeks gestational age, measured from the date of conception, an abortion may be performed only for those purposes and circumstances described in Subsections 2(a), (d), and (e)." Utah Code Ann. § 76-7-302(3).[3] Under the listed subsections, an abortion is allowed when necessary to save the pregnant woman's life, id. § 302(2)(a), to prevent grave damage to the pregnant woman's health, id. § 302(2)(d), or to prevent the birth of a child with grave defects, id. § 302(2)(e). The parties agree that section 302(3) embodies a legislative judgment equating viability with twenty weeks gestational age as measured from conception, and on that basis restricts the availability of abortion after twenty weeks to three narrow circumstances. The district court held that section 302(3) did not constitute an undue burden on a woman's right to choose under Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), because the record before the court contained no evidence that nontherapeutic abortions after twenty weeks had ever been performed in Utah, or that any woman in Utah wants or has ever attempted to obtain an abortion that late in her pregnancy. Plaintiffs contend on appeal that, by establishing a date of viability, the statute stands in direct conflict with controlling Supreme Court precedent, and that the statute imposes an undue burden prohibited by Casey. Defendants assert to the contrary that under Casey a state may establish a presumption of viability.
 
 
 4
 In Casey, the Supreme Court reaffirmed the central holding of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that
 
 
 5
 viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions. The soundness or unsoundness of that constitutional judgment in no sense turns on whether viability occurs at approximately 28 weeks, as was usual at the time of Roe, at 23 to 24 weeks, as it sometimes does today, or at some moment even slightly earlier in pregnancy, as it may if fetal respiratory capacity can somehow be enhanced in the future. Whenever it may occur, the attainment of viability may continue to serve as the critical fact, just as it has done since Roe was decided; which is to say that no change in Roe's factual underpinning has left its central holding obsolete, and none supports an argument for overruling it.
 
 
 6
 Casey, 505 U.S. at 860, 112 S.Ct. at 2811-12.
 
 
 7
 After the decision in Roe, the Supreme Court addressed the critical definition of viability in a series of cases. In Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Court stated it had "recognized in Roe that viability was a matter of medical judgment, skill, and technical ability, and we preserved the flexibility of the term." Id. at 64, 96 S.Ct. at 2838-39. Accordingly, the Court held:
 
 
 8
 [I]t is not the proper function of the legislature or the courts to place viability, which essentially is a medical concept, at a specific point in the gestation period. The time when viability is achieved may vary with each pregnancy, and the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician.
 
 
 9
 Id.
 
 
 10
 In Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), the Court reviewed its holdings in Roe, its companion case, Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), and Danforth, and pointed out that those cases had "stressed viability, [and] declared its determination to be a matter for medical judgment." 439 U.S. at 388, 99 S.Ct. at 682.
 
 
 11
 We reaffirm these principles. Viability is reached when, in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support. Because this point may differ with each pregnancy, neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability--be it weeks of gestation or fetal weight or any other single factor--as the determinant of when the State has a compelling interest in the life or health of the fetus. Viability is the critical point. And we have recognized no attempt to stretch the point of viability one way or the other.
 
 
 12
 Id. at 388-89, 99 S.Ct. at 682. Finally, in Webster v. Reproductive Health Servs., 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), the Court reiterated its holdings in Danforth and Colautti that the determination of viability is a matter for the judgment of the attending physician, and that therefore the legislature could not give one element, such as gestational age, dispositive weight. See id. at 516-17, 109 S.Ct. at 3055-56 (plurality); id. at 526-27, 109 S.Ct. at 3061-62 (O'Connor, J., concurring); id. at 545 n. 6, 109 S.Ct. at 3071 n. 6 (Blackmun, J., joined by Brennan, J., and Marshall, J., concurring and dissenting).
 
 
 13
 It is indisputable that section 302(3) of the Utah abortion statute, which effectively defines viability as occurring at twenty weeks gestational age, is directly contrary to the Supreme Court authority set out above. Defendants argue that the section nonetheless passes constitutional muster under Casey. In deciding that issue, we must first determine the standard of review applicable after Casey.
 
 
 14
 In Casey, the Court held that "[o]nly where state regulation imposes an undue burden on a woman's ability to [choose to terminate or continue her pregnancy before viability] does the power of the State reach into the heart of the liberty protected by the Due Process Clause." Casey, 505 U.S. at 874, 112 S.Ct. at 2819. In so doing, the Court expressly rejected the strict scrutiny standard applied by cases after Roe to evaluate regulations bearing upon the abortion decision. See id. at 871, 112 S.Ct. at 2817. Plaintiffs argue that the Court's rejection of strict scrutiny was directed only to previability abortions, and that this standard still governs in the context of postviability abortions. We believe this argument misperceives the nature of the alleged constitutional flaw in section 302(3). If that section is constitutionally impermissible, it is because by mandating a definition of viability that may not be correct in a given case, it impacts the choice of a woman whose fetus remains nonviable after twenty weeks from conception. The section therefore is most properly analyzed under the standard applicable to previability regulations.
 
 
 15
 That determination does not end the inquiry, however, because the standard applicable to previability regulations after Casey is a matter of some dispute. See Planned Parenthood v. Miller, 63 F.3d 1452, 1456-58 (8th Cir.1995) (noting split in circuits and among Justices). The district court in this case appears to have applied the test set out in United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), which requires the challenger to establish that no set of circumstances exists under which the law would be valid. See Jane L. III, 809 F.Supp. at 871-72, 878 & n. 33. Although the Court in Casey did not expressly reject the Salerno test, it did not apply it. Instead the Court evaluated the regulations under the "undue burden" standard, which invalidates a state regulation that has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Casey, 505 U.S. at 877, 112 S.Ct. at 2820. In articulating the "undue burden" standard, the Court stated that it was "set[ting] forth a standard of general applicability." Casey, 505 U.S. at 876, 112 S.Ct. at 2820. We therefore agree with the Eighth Circuit in Miller, 63 F.3d at 1458, that the proper test after Casey is the "undue burden" standard applied by the Court in that case.[4]
 
 
 16
 Under Casey, "[a]n undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." 505 U.S. at 878, 112 S.Ct. at 2821. "A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." Id. at 877, 112 S.Ct. at 2820. "Legislative purpose to accomplish a constitutionally forbidden result may be found when that purpose was 'the predominant factor motivating the legislature's decision.' Such a forbidden purpose may be gleaned both from the structure of the legislation and from examination of the process that led to its enactment." Armstrong v. Mazurek, 94 F.3d 566, 567 (9th Cir.1996) (quoting Miller v. Johnson, --- U.S. ----, ----, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995) and citing Shaw v. Hunt, --- U.S. ----, ---- - ----, 116 S.Ct. 1894, 1899-1901, 135 L.Ed.2d 207 (1996)).[5]
 
 
 17
 As we pointed out in Jane L. IV, 61 F.3d at 1495, the Utah legislature's intent in passing the abortion provisions was to provide a vehicle by which to challenge Roe v. Wade, as demonstrated by the legislature's establishment of an abortion litigation trust account. In so doing, the State made a deliberate decision to disregard controlling Supreme Court precedent set out in Roe, Danforth, Colautti, and Webster, and to ignore the Supreme Court's repeated directive that viability is a matter for an attending physician to determine.[6] In our view, the State's determination to define viability in a manner specifically and repeatedly condemned by the Court evinces an intent to prevent a woman from exercising her right to choose an abortion after twenty weeks in those instances in which the fetus is not viable. This intent is confirmed by the State's briefs on appeal, in which the State in essence concedes that the section was intended to prevent the nontherapeutic abortion of nonviable fetuses after twenty weeks because in the State's view women who seek such abortions have waited too long. Contrary to the Court's reaffirmation in Casey that a woman has a right to terminate her pregnancy before viability, see Casey, 505 U.S. at 870-71, 112 S.Ct. at 2816-17, the State defends section 302(3) because it "requir[es] pregnant women to exercise their right to choose nontherapeutic abortion during the many weeks prior to the 21st week postconception--after which the abortion process is difficult and traumatic without regard to fetal viability." Br. of Aplees. on Remand, at 21 (emphasis added). In sum, we conclude that section 302(3) was enacted with the specific purpose of placing an insurmountable obstacle in the path of a woman seeking the nontherapeutic abortion of a nonviable fetus after twenty weeks, and it therefore imposes an unconstitutional undue burden on her right to choose under Casey.
 
 
 18
 We also conclude that the section is invalid because it has an impermissible effect. "[A] statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." Casey, 505 U.S. at 877, 112 S.Ct. at 2820. The Supreme Court made clear in Casey that in determining effect, "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects.... The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." Id. at 894, 112 S.Ct. at 2829. In addressing whether section 302(3) is an undue burden, therefore, Casey instructs us that we must assess its impact on the women upon whom it operates, that is, those women seeking nontherapeutic abortions of nonviable fetuses after twenty weeks from conception. For those women, section 302(3) imposes more than a substantial obstacle; it constitutes an outright ban.
 
 
 19
 The district court held as a matter of law that section 302(3) nevertheless does not impose an undue burden under Casey because the record contains no evidence that any woman wants or has attempted to obtain such a late nontherapeutic abortion in Utah. Jane L. III, 809 F.Supp. at 873. Plaintiffs contend that the lower court's view of the record for summary judgment purposes is erroneous. We agree. The record contains evidence through the declaration of the director of the Utah Women's Health Clinic, a facility that performs approximately seventy-five percent of the abortions in Utah, that the Clinic routinely refers to another state those Utah residents needing an abortion after twenty weeks. She stated that in 1990, for example, the Clinic referred out of state ten to fifteen women who needed such abortions. Supp.App. of Aplees., at 158-60. While this and other evidence in the record indicate that the number of women in Utah desiring abortions after twenty weeks may be small, the undisputed evidence also demonstrates that some members of this group are women seeking nontherapeutic abortions of nonviable fetuses. It is thus apparent that a group of women exists in Utah for whom section 302(3) actually operates as an impermissible ban on the right to abort a nonviable fetus.
 
 
 20
 We accordingly hold that section 302(3) has both the purpose and effect of placing a substantial obstacle in the path of a woman seeking to abort a nonviable fetus. It therefore imposes an undue burden on a woman's right to choose. The State's arguments to the contrary are disingenuous and unpersuasive because they are grounded on its continued refusal to accept governing Supreme Court authority holding that viability is a matter to be determined by an attending physician, and that until viability is actually present the State may not prevent a woman from choosing to abort.
 
 
 21
 In sum, we hold that section 302(3) is unconstitutional in that it unduly burdens a woman's right to choose to abort a nonviable fetus.[7] For the reasons set out in our prior opinion, 61 F.3d at 1505, as modified herein, we AFFIRM the judgment of the district court in part and REVERSE in part.
 
 
 
 *
 Honorable Wesley E. Brown, Senior United States District Judge, District of Kansas, sitting by designation
 
 
 [1]
 In addition to holding that Utah Code Ann. § 76-7-302(3) (1995) was not severable, we also held that the provision on fetal experimentation, id. § 310, was unconstitutionally vague, and that the sections governing the choice of methods for postviability abortions, id. §§ 307, 308, were unconstitutional. See Jane L. IV, 61 F.3d at 1499-1505. The Supreme Court expressly did not review those rulings and we do not revisit them here
 
 
 [2]
 The panel heard argument on this issue before deciding Jane L. IV. We have determined unanimously that additional oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9
 
 
 [3]
 Gestational age is generally "determined by computing the time from the first day of the last menstrual period [lmp]." 2 J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine at G-63 (1996). Utah law, however, measures gestational age differently and perhaps uniquely by computing it from the date of conception. Thus, "20 weeks gestational age" as used in section 302(3) equates with 22 weeks gestational age as this computation is generally made
 
 
 [4]
 The undue burden test is meant to evaluate the constitutionality of regulations that burden a woman's right to choose a previability abortion. Section 302(3) does much more than pose an obstacle to that choice. It defines viability in terms of gestational age. For a woman seeking the nontherapeutic abortion of a fetus that is not viable despite fitting the statutory definition in section 302(3), however, that section goes beyond creating a hindrance and imposes an outright ban. Rather than apply Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), in these circumstances, it may be more appropriate simply to conclude that the section is invalid as contrary to controlling Supreme Court precedent precluding a legislature from defining the critical fact of viability as Utah has done here. In any event, as we discuss in text, section 302(3) is clearly invalid under Casey as having both the purpose and effect of placing a substantial burden on a woman's decision to choose a previability abortion
 
 
 [5]
 Neither the district court nor the State has focused on the fact that under Casey, a law is invalid if either its purpose or effect is to place a substantial obstacle in the path of a woman seeking to abort a nonviable fetus. See Casey, 505 U.S. at 877, 112 S.Ct. at 2820-21. The district court did not analyze the purpose of section 302(3) in assessing whether it poses an undue burden, addressing only its effect. See Jane L. v. Bangerter, 809 F.Supp. 865, 873-74 (D.Utah 1992) (Jane L. III ). The State makes only a passing reference to purpose on appeal. Indeed, as we point out in text, to the extent the State addresses purpose at all, it concedes that the section's purpose is to prevent the abortion of nonviable fetuses after 20 weeks from conception
 
 
 [6]
 The State contends these cases are no longer valid after Casey to the extent they commit the determination of viability to the medical judgment of the attending physician and prohibit a legislature from defining viability in terms of gestational age. To the contrary, we view the Court's reaffirmation in Casey that "[w]henever it may occur, the attainment of viability may continue to serve as the critical fact, just as it has done since Roe was decided," 505 U.S. at 860, 112 S.Ct. at 2811-12, coupled with the Court's failure to disturb clear past precedent on how viability is to be determined, as convincing indications that those precedents still govern the issue. Moreover, it is important to emphasize that the Utah provisions were passed before Casey was handed down. Consequently, Casey's effect on these cases sheds no light on the State's purpose in passing legislation in direct conflict with them
 
 
 [7]
 Because we strike down section 302(3) as unconstitutional, we need not reach plaintiffs' challenge to one of the circumstances in which a woman may obtain a postviability abortion. Under section 302(3), such an abortion is permitted, inter alia, to prevent grave damage to the woman's health. Plaintiffs argue that this provision goes beyond the holding in Roe, reaffirmed in Casey, that a State may proscribe postviability "abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." Casey, 505 U.S. at 879, 112 S.Ct. at 2821 (quoting Roe, 410 U.S. at 164-65, 93 S.Ct. at 732-33)
 We note nevertheless that we addressed identical language in Jane L. IV when considering the constitutionality of the Utah provisions governing a doctor's choice of methods for performing postviability abortions. See Jane L. IV, 61 F.3d at 1502-05. Those provisions would "require a doctor to use the abortion method that would best assure the unborn child's chances of survival unless such a method would gravely damage a woman's health." Id. at 1503. We held that "[b]y requiring a woman to suffer 'grave damage' to her health before her liberty interests predominate, the Utah legislature violated those portions of Roe and Thornburgh [v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779(1986) ] that Casey reaffirmed, and unconstitutionally devalued a woman's privacy rights." Jane L. IV, 61 F.3d at 1504.