COLE, J., delivered the opinion of the court, in which GIBBONS, J. joined. ROGERS, J. (pp. 374-78), delivered a separate concurring opinion.
OPINION
R. GUY COLE, JR., Circuit Judge.
In this facial constitutional attack, Plaintiffs-Appellants Cincinnati Women’s Services (“CWS”) and Dr. Walter Bowers, CWS’s medical director, appeal the district court’s judgment upholding two provisions of Ohio House Bill 421, a law enacted by the Ohio General Assembly in 1998 concerning the regulation of abortions. The first of these provisions limits minors seeking a judicial bypass of the statutory parental-consent requirement to one petition per pregnancy (“Single-Petition Rule”). The second challenged provision requires women seeking abortions to attend, for informed-consent purposes, an in-person meeting with a physician at least twenty-four hours prior to receiving the abortion (“In-Person Rule”). Following a bench trial, the district court granted judgment in favor of the Defendants.
*364 For the following reasons we REVERSE- the district court’s judgment that the Single-Petition Rule is constitutionally valid and conclude that the Single-Petition Rule is severable from the remainder of the statute. Further, we AFFIRM the district court’s judgment that the In-Person Rule is constitutionally valid and REMAND for further proceedings consistent with this opinion.
I. Background
A. Factual Background
In 1998, the Ohio General Assembly made various substantive changes to Ohio’s law regulating abortion, two of which are at issue in this case: the Single-Petition Rule and the In-Person Rule. See Cincinnati Women’s Servs. v. Taft, No. 1:98-CV-289, — F.Supp.2d -, -, 2005 WL 2206219, 2005 U.S. Dist. LEXIS 23015, at *1-*2 (S.D.Ohio Sept. 8, 2005). Until 1998, Ohio law did not impose any restrictions upon the number of times a minor woman could petition for a judicial bypass of the prior parental-notification rule. The 1998 amendments, however, included the Single-Petition Rule, which limits to once per pregnancy the number of times a minor may seek a judicial bypass in lieu of parental consent. Ohio law makes it a misdemeanor and a tort for any person to perform an abortion on an unemancipated minor unless the attending physician has “secured the written informed consent of the minor and one parent, guardian, or custodian.” Ohio Rev. Code § 2919.121(B)(1) (2005).[1] The statutory amendment permits a minor woman to petition a juvenile court for a judicial bypass of parental consent if “the court finds that the minor is sufficiently mature and well enough informed to decide intelligently whether to have an abortion” or that “the abortion is. in the best interests of the minor.” Id. § 2919.121(C)(3). The Single-Petition Rule further provides that “[n]o juvenile court shall have jurisdiction to rehear a petition concerning the same pregnancy once a juvenile court has granted or denied the petition.” Id. § 2919.121(C)(4).
In evaluating the probable impact of the Single-Petition Rule, the district court found that “[m]ost judicial bypasses occur in the first trimester of a minor’s pregnancy.” Taft, — F.Supp.2d at -, 2005 U.S. Dist. LEXIS 23015, at *27. The district court also found that “there have been times when it was apparent that a bypass was denied because the minor failed by oversight to adequately discuss facts that the minor knew or could easily learn.” Id. at-, 2005 U.S. Dist. LEXIS 23015, at *28. One witness, a part-time magistrate in the Cuyahoga County Juvenile Court in Cleveland, testified that in such situations he has advised the minor’s attorney to file another bypass petition during the same pregnancy. Id. at-- -, 2005 U.S. Dist. LEXIS 23015, at *27-*28.
The 1998 statutory amendment also modifies prior ■ law by requiring women seeking abortions to attend an in-person meeting with a physician for informed-consent purposes. See Ohio Rev.Code § 2317.56(B)(1) (2005). “The meeting need not occur at the facility where the abortion is to be performed or induced, and the physician involved in the meeting need not be affiliated with that facility or with the physician who is scheduled to perform or induce the abortion.” Id. Although Ohio’s prior abortion regulation required informed consent before a woman underwent an abortion, the law did not *365 contain any requirement that the meeting take place in person. See Ohio Rev.Code § 2317.56(B)(1) (1997) (“At least twenty-four hours prior to the performance or inducement of the abortion, a physician informs the pregnant woman, verbally or by other nonwritten means of communication .... ”). Ohio’s Attorney General issued an opinion in 1994 interpreting the older version of section 2317.56(B)(1) tq permit videotaped or audiotaped physician statements. See 1994 Ohio Op. Att’y Gen. No. 94-094, 1994 WL 725885. The challenged provision thus changed the status quo to require that a woman seeking an abortion receive informed consent in-person, by any physician, rather than “verbally or by other nonwritten means.” Id.
CWS is a healthcare provider that provides contraceptive services and performs pregnancy testing and abortions. . See Taft, — F.Supp.2d at -, 2005 U.S. Dist. LEXIS 23015, at *19. When a woman inquires about obtaining an abortion from CWS, her first contact is generally by phone. Id. at -, 2005 U.S. Dist. LEXIS 23015, at *20. CWS employees inform her of CWS’s abortion process and invite her to schedule two appointments. Id. “The first appointment is for an informed consent visit and the second appointment is for an actual procedure.” Id.
In evaluating the impact of the In-Person Rule on CWS, the district court found that the In-Person Rule will have the practical effect of requiring all of CWS’s own clients to come to its premises twice, once for the informed-consent meeting with a physician affiliated with CWS, and a second time for the procedure. See id. at -, -, -, -, 2005 U.S. Dist. LEXIS 23015, at *12, *20, *36, *39. The district court found that CWS currently excuses approximately 5 to 10 percent of its patients from its normal two-visit protocol. Id. at-, 2005 U.S. Dist. LEXIS 23015, at *24. “Some women are excused from coming because of the distance of their residencies from the clinic, their lack of resources, or because of interference from an abusive partner.” Id. The district court found that 7 to 18 percent of those excused by CWS are excused because of “partner abuse.” Id. Excused patients “receive all the information about the procedure via mail and are given the opportunity to listen to an audio version” of the informed consent video tape, and to speak with CWS’s “patient advocates.” Id. Witnesses from two other abortion clinics— Capital Care clinic in Columbus and Center for Choice clinic in Toledo — testified that their clinics excuse 5 to 10 percent of their patients from their own two-visit protocols. Id. at-, 2005 U.S. Dist. LEXIS 23015, at *25. Twenty to 25 percent of this excused group are “abused women.” Id.
B. Procedural Background
Several weeks before the Act’s effective date, CWS filed a pre-enforcement facial attack against two of the Act’s provisions, naming the Governor of Ohio and various other government officials as defendants. Taft, - F.Supp.2d at -, 2005 U.S. Dist. LEXIS 23015, at *3. CWS sought injunctive and declaratory relief on the grounds that the statutory provisions are unconstitutionally vague and invalid under Supreme Court precedent. Following a bench trial, the district court upheld both provisions. With respect to the Single-Petition Rule, the district court reasoned that Supreme Court precedent does not “require[ ] the state to afford a minor virtually unlimited opportunities to petition for a bypass.” Id. at-, 2005 U.S. Dist. LEXIS 23015, at *46. Assuming that striking down the Single-Petition Rule would mandate “limitless opportunities to petition for a bypass” during the same pregnancy, the district court determined *366 that “such a requirement would conflict with Casey in that the state could completely prohibit minors from even obtaining an abortion except where necessary to preserve the life or health of the minor.” Id. at---, 2005 U.S. Dist. LEXIS 23015, at *46-*47 (citing Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 879, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)).
The district court also held that the Single-Petition Rule “does not impose any undue burden even in the pre-viability context.” Id. at-, 2005 U.S. Dist. LEXIS 23015, at *47. To find otherwise, the district court concluded that it would have to engage in speculation and guesswork about the following: (1) what fraction of subsequent petitioners’ bypass petitions had been denied due to a lack of understanding of the abortion procedure; (2) whether a petitioner’s increased understanding in a second proceeding would be enough to tip the balance in favor of granting a bypass; and (3) what proportion of subsequent petitioners would develop fetal anomalies after an unsuccessful petition in the first trimester (the district court concluded that a minor who discovered such a fetal anomaly likely had access to prenatal care, “which leads one to conclude further that she has a parent or guardian involved in her pregnancy to pay the medical bills”). See id. at---, 2005 U.S. Dist. LEXIS 23015, at *47-*50. The district court also determined that it would be pure speculation to conclude that a large fraction of parents would withhold consent for an abortion from a minor. See id. at-, 2005 U.S. Dist. LEXIS 23015, at *50. Finally, the district court held that the Single-Petition Rule need not contain a mental-health exception, and that the general maternal-health exception was constitutional even though it had been “promulgated in the form of an affirmative defense.” See id. at---, -, 2005 U.S. Dist. LEXIS 23015, at *51-*52, *53.
Likewise, the district court upheld the In-Person Rule because it “does not create a substantial obstacle for women seeking abortions.” Id. at-, 2005 U.S. Dist. LEXIS 23015, at *29. While granting that the In-Person Rule could have the effect of delaying abortions up to two weeks, the district court held that a “delay of up to two weeks, however, does not impose an undue burden on women seeking abortions.” Id. at-, 2005 U.S. Dist. LEXIS 23015, at *30. The district court relied on the Supreme Court’s ruling in Casey, which upheld Pennsylvania’s similar informed-consent statute.
Addressing the “most difficult question to answer,” the district court rejected CWS’s argument that the In-Person Rule would increase the probability that abusive partners would learn about the pregnancy or the attempt to obtain an abortion, thereby causing an undue burden on the abortion-seeking woman’s constitutional right to an abortion. See id. at-, 2005 U.S. Dist. LEXIS 23015, at *3.9. After reviewing the testimonial and record evidence received at trial, the district court concluded that the evidence did not establish what proportion of the abused women would be blocked from obtaining abortions. See id. at---, 2005 U.S. Dist. LEXIS 23015, at *39-*42. The district court thus concluded that it could not strike down the In-Person Rule under Casey’s “large fraction” test. See id. at-, 2005 U.S. Dist. LEXIS 23015, at *41.
This timely appeal followed. Enforcement of the Single-Petition Rule, but not the In-Person Rule, has been enjoined pending resolution of this appeal.[2]
*367 II. The Large Fraction Test
Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), sets the standard that we are bound to apply in facial challenges to abortion restrictions. In Casey, the Supreme Court set forth the test that must be applied in analyzing whether a restriction placed on a woman’s constitutional right to an abortion is an “undue burden” on that right, thereby rendering the restriction facially unconstitutional. Id. at 878, 894-95, 112 S.Ct. 2791. The Supreme Court determined that, because “[ljegislation is measured for consistency with the Constitution by its impact on those whose conduct it affects,” when analyzing abortion restrictions, “[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.” Id. at 894, 112 S.Ct. 2791. Therefore, if, “in a large fraction of the cases in which [the abortion restriction] is relevant, it will operate as a substantial obstacle to a woman’s choice to undergo an abortion,” then reviewing courts should find that the restriction is an “undue burden, and therefore invalid.” Id. at 895, 112 S.Ct. 2791. This test has come to be known as the Casey “large fraction” test.
In the intervening decade, the Supreme Court has not abandoned Casey. See, e.g., Planned Parenthood v. Casey, 510 U.S. 1309, 114 S.Ct. 909, 910, 127 L.Ed.2d 352 (1994) (Souter, J., denying application for stay of mandate) (if an abortion restriction interposes a substantial obstacle on a large fraction of the affected population, it is an unconstitutional violation of “the exercise of the right to reproductive freedom guaranteed by the Due Process Clause and affirmed in th[e] Court’s Casey opinion” (citations omitted)); Fargo Women’s Health Org. v. Schafer, 507 U.S. 1013, 1014, 113 S.Ct. 1668, 123 L.Ed.2d 285 (1993) (O’Connor, J., concurring) (“[W]e made clear that a law restricting abortions constitutes an undue burden, and hence is invalid, if, in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman’s choice to undergo an abortion.” (internal citation to Casey omitted)).[3]
*368 In United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Supreme Court held that, to succeed in a facial constitutional challenge, “the challenger must establish that no set of circumstances exists under which the [law] would be valid.” However, in considering facial challenges to abortion restrictions, every circuit, with one exception, has applied Casey’s test rather than Salerno’s more restrictive “no set of circumstances” test. See Nat’l Abortion Fed’n v. Gonzales, 437 F.3d at 294 (Walker, Jr., C.J., concurring) (“As it stands now, however, the Supreme Court appears to have adopted the ‘large fraction’ standard ... for those who seek to challenge an abortion regulation as facially unconstitutional.”); Richmond Med. Ctr. for Women v. Hicks, 409 F.3d 619, 628 (4th Cir.2005) (holding that “Salerno’s ‘no set of circumstances’ standard does not apply in the context of a facial challenge ... to a statute regulating a woman’s access to abortion”); Planned Parenthood v. Heed, 390 F.3d 53, 57 (1 st Cir.2004), vacated on other grounds by Ayotte v. Planned Parenthood, — U.S.-, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (determining that Casey’s large-fraction test is properly applied to facial abortion-restriction challenges); A Woman’s Choice-E. Side Women’s Clinic v. Newman, 305 F.3d 684, 687, 698-99 (7th Cir.2002) (an abortion restriction “will be deemed valid unless, in a large fraction of the cases in which the law is relevant, it will operate as a substantial obstacle to a woman’s choice to undergo abortion” (internal citation omitted)); Planned Parenthood of Cent. N.J. v. Farmer, 220 F.3d 127, 142-43 (3d Cir.2000) (“a plaintiff must show that an abortion regulation would be an undue burden in a large fraction of the cases in which that regulation is relevant”); Planned Parenthood of S. Ariz. v. Lawall, 180 F.3d 1022, 1027, amended on denial of reh’g, 193 F.3d 1042 (9th Cir.1999) (following the “great weight of circuit authority holding that Casey has overruled Salerno in the context of facial challenges to abortion statutes”); Jane L. v. Bangerter, 102 F.3d 1112, 1116 (10th Cir.1996) (noting that the Casey Court “did not apply” the Salerno test, but rather “evaluated the regulations under the undue burden standard”); Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1456-58 (8th Cir.1995) (opting to “follow what the Supreme Court actually did — rather than what it failed to say — and apply the undue-burden test” which requires a court to invalidate an abortion restriction if the law “operatefs] as a substantial obstacle to a woman’s choice to undergo an abortion in a large fraction of the cases in which [it] is relevant” (quotation omitted)). The Fifth Circuit stands alone in its rejection of the large fraction test. See Barnes v. Moore, 970 F.2d 12, 14 (5th Cir.1992) (holding that a plaintiff must “establish that no set f circumstances exists under which the Act *369 would be valid” (quoting Salerno, 481 U.S. at 745, 107 S.Ct. 2095)).[4]
Like the majority of other circuits, this Court too has followed Casey’s large-fraction test in analyzing facial attacks on abortion regulations. In deciding whether a pre-viability abortion restriction passes facial constitutional muster, we “determine whether ‘in a large fraction of the eases in which [the ban] is relevant, it will operate as a substantial obstacle to a woman’s choice to undergo an abortion.’ ” Women’s Med. Prof'l Corp. v. Voinovich, 130 F.3d 187, 196 (6th Cir.1997) (quoting Casey, 505 U.S. at 895, 112 S.Ct. 2791). This has been our repeated and continuous practice. See, e.g., Women’s Med. Prof'l Corp. v. Baird, 438 F.3d 595, 607 (6th Cir.2006) (following Casey’s holding that “a regulation is an undue burden if ‘in a large fraction of the cases in which [the regulation] is relevant, it will operate as a substantial obstacle to a woman’s choice to undergo an abortion’ ” (quoting Casey, 505 U.S. at 895, 112 S.Ct. 2791)); Memphis Planned Parenthood v. Sundquist, 175 F.3d 456, 477 n. 3 (6th Cir.1999) (“When considering [whether a] statute [that regulates abortion] is unconstitutional on its face, we must analyze the factual record to determine whether the challenged regulation in a large fraction of the cases in which it is relevant, will operate as a substantial obstacle to a woman’s choice to undergo an abortion” (citing Casey, 505 U.S. at 895, 112 S.Ct. 2791) (emphasis added)); see also Women’s Med. Prof'l Corp. v. Taft, 353 F.3d 436, 443, 446 (6th Cir.2003) (holding that “a state may regulate abortion before viability as long as it does not impose an ‘undue burden’ on a woman’s right to terminate her pregnancy,” and that “an ‘undue burden’ exists when ‘a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus’ ” (citing Casey, 505 U.S. at 876-77,112 S.Ct. 2791)).
Thus, our path is clear: We must follow Casey’s large-fraction test in analyzing the facial challenge to the two abortion restrictions before us. Accordingly, we asses whether Ohio’s abortion restrictions present a substantial obstacle to obtaining an abortion for a large fraction of the women for whom the restrictions are relevant. Casey, 505 U.S. at 895, 112 S.Ct. 2791.
III. The Single-Petition Rule
A. Constitutionality of the Single-Petition Rule
If a state requires parental consent before an unemancipated minor woman receives an abortion, it must provide for a judicial or administrative procedure so that a minor woman who satisfies certain conditions may bypass the consent requirement. See Bellotti v. Baird, 443 U.S. 622, 647-51, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion) (“Bellotti II”). If a minor woman establishes either “that she is mature enough and well enough informed to make the abortion decision independently” or “that the abortion would be in her best interests,” the reviewing court or agency must issue the bypass. Lambert v. Wicklund, 520 U.S. 292, 295, 117 S.Ct. 1169, 137 L.Ed.2d 464 (1997) (citation omitted). Otherwise, the attendant bypass procedure is constitutionally invalid. See Bellotti II, 443 U.S. at 643-44, 99 S.Ct. 3035.
*370 Ohio provides for a judicial-bypass procedure that apparently encompasses the procedural requirements set forth in Lambert and Bellotti II. Ohio, however, seeks to limit a minor woman to filing one petition for a bypass per pregnancy. The Supreme Court has never determined whether an abortion restriction preventing a minor woman from filing multiple bypass petitions violates the Constitution. We must, therefore, analyze whether Ohio’s restriction to the judicial-bypass procedure constitutes an undue burden under Casey’s large-fraction test.
In Casey, the Supreme Court analyzed a spousal-notification law that required a married woman who wished to abort her pregnancy to first notify her husband, unless she fit into a statutorily exempted category. Casey, 505 U.S. at 887-88, 112 S.Ct. 2791. The Supreme Court held that, in determining whether this restriction was an undue burden, the “proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.” Id. at 894, 112 S.Ct. 2791. Therefore, while the restriction ostensibly affected all married women seeking an abortion, the spousal-notification restriction was only relevant to married women seeking an abortion who did not fit into a statutory exception to the notification requirement and did not desire to inform their husbands about the abortion. Id. at 894-95, 112 S.Ct. 2791. Of the women for whom the restriction was actually relevant, many of whom were at risk for spousal abuse, the restriction would “operate as a substantial obstacle” to a “large-fraction.” Id. Casey thus requires courts to determine whether a large fraction of the women “for whom the law is a restriction” will be “deterred from procuring an abortion as surely as if the [government] has outlawed abortion in all cases.” Id. at 894, 112 S.Ct. 2791. The spousal-notification law in Casey was facially unconstitutional because it satisfied that test. Id. at 895, 112 S.Ct. 2791.
Applying Casey to the Single-Petition Rule before us, we find that the group of women for whom the restriction actually operates are women who are denied a bypass and who have changed circumstances such that if they were able to reapply for a bypass, it would be granted. The group of women who will be deterred from procuring an abortion because of the restriction are women with changed circumstances who would apply for another bypass if allowed. The record shows that second petitioners exist under Ohio’s current bypass scheme, and that practically all second petitioners allege changed circumstances such that, if believed, a reviewing court must issue a bypass. The changed circumstances that affect abortion-seeking minors include increased maturity, increased medical knowledge about abortion, and pregnant minors who discover that their fetus has a medical anomaly such as gastroschisis.[5] The record further shows that most women who are denied a bypass but who experience a change in their circumstances will subsequently seek another bypass procedure. Because Ohio’s law preventing more than one petition per procedure acts as a substantial obstacle to a woman’s right to an abortion in a large fraction of the cases in which the single petition is relevant, we find that the Single-Petition Rule is an undue burden and, therefore, is facially unconstitutional.
In sum, because the Single-Petition Rule fails under Casey’s large-fraction *371 test, we hold that it is facially unconstitutional.
B. Severability of the Single-Petition Rule
The Single-Petition Rule is severable from the remainder of Ohio’s statute regulating abortion. Therefore, our finding that the Single-Petition Rule does not survive constitutional scrutiny is not fatal to the remainder of the regulations.
In Ayotte v. Planned Parenthood of N. New Eng., — U.S.-, 126 S.Ct. 961, 964, 163 L.Ed.2d 812 (2006), the Supreme Court held that a reviewing court need not invalidate an entire statute when the court “may be able to render narrower declaratory and injunctive relief.” The “normal rule” is that “partial, rather than facial, invalidation is the required course.” Id. at 968 (quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)). “So long as [the reviewing court is] faithful to legislative intent,” the court “can issue a declaratory judgment and an injunction prohibiting the statute’s unconstitutional application.” Id. at 969.
 Whether a portion of a state’s statute is severable is determined by the law of that state. See Voinovich, 130 F.3d at 202. In Ohio, “statutory provisions are presumptively severable.” Id. Ohio law provides that:
If any provisions of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable.
Ohio Rev.Code § 1.50 (2006). A provision may be severed only if “severance will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part.” Voinovich, 130 F.3d at 202 (citing State ex rel. Maurer v. Sheward, 71 Ohio St.3d 513, 644 N.E.2d 369, 377 (1994)).
Ohio has devised a three-factor test that determines whether severance will cause such a disruption:
(1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?
Id. (quoting Geiger v. Geiger, 117 Ohio St. 451,160 N.E. 28, 33 (1927)).
Applying this test, we find that the Single-Petition Rule may be severed. As to the first part of the test, the Single-Petition Rule can be read independently. Nothing in the remainder of the bypass scheme inherently requires a limit on the number of petitions. The Single-Petition Rule is therefore “capable of separation.” As to the second part of the test, excising the Single-Petition Rule is not so connected to the general scope of the bypass scheme that other provisions would not have their intended effect if the court removed it. Under the final part of the test, we need only eliminate, not add, words to strike down the Single-Petition Rule. The Single-Petition Rule can simply be deleted. The invalidity of the Single-Petition Rule does not affect the remainder of Ohio’s parental consent law and, therefore, is severable.
*372 IV. The In-Person Rule
We now turn to the In-Person Rule. Although Casey upheld both an in-person informed-consent requirement and a twenty-four-hour ' notification requirement, the record in Casey as to these two issues was sparse. In the Casey Court’s words, “there is no evidence on this record that requiring a doctor to give the information as provided by the statute would amount in practical terms to a substantial obstacle to a woman seeking an abortion.” Casey, 505 U.S. at 884, 112 S.Ct. 2791. Therefore, the Court concluded that the in-person informed-consent requirement did not constitute an undue burden. Id. at 885, 112 S.Ct. 2791; see also id. at 887,112 S.Ct. 2791 (“Hence, on the record before us, and in the context of this facial challenge, we are not convinced that the 24-hour waiting period constitutes an undue burden.”).
The sum of the evidence before the Casey Court concerning the twenty-four-hour notification requirement was as follows:
The findings of fact ... indicate that because of the distances many women must travel to reach an abortion provider, the practical effect will often be a delay of much more than a day because the waiting period requires that a woman seeking an abortion make at least two visits to the doctor. [I]n many instances this will increase the exposure of women seeking abortions to “the harassment and hostility of anti-abortion protestors demonstrating outside a clinic.” As a result, ... for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24-hour waiting period will be “particularly burdensome.”
Id. at 885-86,112 S.Ct. 2791. On the basis of these facts, and without reference to abused women, the Supreme Court declined to find an undue burden. The record evidence concerning abused women available to the Casey Court centered entirely on the impact on such women of the spousal-notification requirement. See Casey, 505 U.S. at 888-94, 112 S.Ct. 2791. These admittedly extensive facts did not discuss the impact on abused women of the in-person informed-consent requirement. Id.
The Appellants in the case at bar were obviously aware of the Casey Court’s reliance on the paucity of the record concerning how the in-person informed-consent requirement affected abused women in declining to find an undue burden. In an attempt to establish that there are abused women who effectively cannot obtain in-person informed consent with a physician at least twenty-four hours prior to receiving an abortion, the Appellants amassed an impressive amount of data, akin to the data available in Casey on the issue of spousal notification.
The record shows that three Ohio abortion providers, by their own policies, currently require women to come in for an in-person informed-consent meeting prior to obtaining an abortion. This meeting does not have to be with a physician. Some abortion-seeking women request to be excused from the in-person meeting. Some of these requests are denied by the clinics. Attendance is excused for women who “simply live too far away” or have “income or [other] hardship” reasons. Women excused from the in-person informed-consent meeting constitute 5 to 10 percent of abortion-seeking women. According to Appellants, the in-person meeting is all but impossible for women “in abusive situations,” who constitute approximately 25 percent of the women excused by the clinics’ in-person requirement. Of this 25 percent, 12.5 percent would be precluded altogether *373 from obtaining an abortion as a result of the In-Person Rule. For abused women, appearing in person twice is difficult and, in some cases, life-threatening. Any woman who is excused from the in-person informed-consent meeting receives videos and literature through the mail sent to her or another address of her choice. All other women are required to come in for an in-person meeting prior to obtaining an abortion.
Therefore, of every 1000 women who seek an abortion, 50 to 100 are excused by the clinic from an in-person informed-consent meeting. According to the facts provided by the clinics, 6 to 12.5 of those 50 to 100 excused women will face a substantial obstacle in obtaining an abortion if forced to comply with the In-Person Rule. Therefore, for approximately 6 to 12.5 women out of every 1000 women seeking an abortion, the state’s In-Person Rule would likely deter them “from procuring an abortion as surely as if [Ohio] has outlawed abortion in all cases.” Casey, 505 U.S. at 894, 112 S.Ct. 2791.
Thus, Appellants have improved on the Casey record, at least with respect to the issue of informed consent. Nevertheless, we find that the restriction survives constitutional scrutiny. The parties agree that the group of women who will be deterred from obtaining an abortion because of the restriction are the 12.5 women who, due to domestic abuse, cannot meet the in-person informed-consent requirement without grave risk of retaliation. The parties disagree, however, over the definition of the group for whom the law is a restriction. Appellants argue that the 12.5 women who will not obtain an abortion as a result of the restriction should be compared against all women actually affected by the in-person requirement, defined as all women who are presently excused by the clinic from the clinic’s own in-person informed-consent requirement. Ohio argues, on the other hand, that the group for whom the law is actually relevant is all women seeking an abortion.
Unlike the parties, we find that the group for whom the law is a restriction for purposes of applying Casey’s large fraction test is “all women who seek an exception to the clinic’s in-person informed-consent requirement.” The record does not reflect this number.
Yet; even accepting the definition urged by Appellants, we do not find a substantial burden under Casey. This Court has previously found that a large fraction exists when a statute renders it nearly impossible for the women actually affected by an abortion restriction to obtain an abortion. Voinovich, 130 F.3d at 201. Importantly, in Voinovich, a large fraction was found because all women upon whom the restriction actually operated — i.e., women seeking second-trimester pre-viability abortions — would effectively be barred from exercising their constitutional right to obtain an abortion. Id. Other circuits that have applied the large fraction test to facial challenges to abortion regulations have, likewise, only found a large fraction when practically all of the affected women would face a substantial obstacle in obtaining an abortion. See, e.g., Heed, 390 F.3d at 64; Farmer, 220 F.3d at 145; Miller, 63 F.3d at 1463; see also Neuman, 305 F.3d at 699 (Coffey, J. concurring) (in applying the large-fraction test “it is clear [from Casey ] that a law which incidentally prevents ‘some’ [of the] women [for whom the abortion restriction will actually be a burden] from obtaining abortions passes constitutional muster”). The Casey Court .itself was not persuaded to invalidate Pennsylvania’s parental-consent requirement by record evidence showing that the requirement would altogether prevent some women from obtaining an abortion. *374 Casey, 505 U.S. at 899, 112 S.Ct. 2791; see also Planned Parenthood v. Casey, 744 F.Supp. 1323, 1356-57 (E.D.Pa.1990) (finding that in “some” of the forty-six percent of cases where a minor can neither obtain parental consent nor obtain a judicial bypass, the law “may act in such a way as to deprive [the minor] of her right to have an abortion”).
To date, no circuit has found an abortion restriction to be unconstitutional under Casey’s large-fraction test simply because some small percentage of the women actually affected by the restriction were unable to obtain an abortion. Although a challenged restriction need not operate as a de facto ban for all or even most of the women actually affected, the term “large fraction,” which, in a way, is more conceptual than mathematical, envisions something more than the 12 out of 100 women identified here.
V. Conclusion
For the foregoing reasons, the judgment of the district court upholding the Single-Petition Rule is REVERSED, the judgment upholding the In-Person Rule is AFFIRMED, and the case is REMANDED for further proceedings consistent with this opinion.

. The 1998 statutory amendment also changed Ohio law by requiring parental consent instead of parental notice, but this aspect of the law is not before us.

. Slightly more than a week after CWS filed its complaint, the parties agreed to an order *367 maintaining the status quo — i.e., the state of the law prior to the 1998 amendments — in the form of a preliminary injunction. When the district court entered its final judgment dismissing the case on September 8, 2005, the preliminary injunction was dissolved. The next day the district court issued another order suspending dissolution of the injunction for two weeks. CWS filed a notice of appeal on September 16, 2005. When the order suspending dissolution of the injunction ran its course, the district court, on September 22, 2005, denied CWS’s motion to stay the judgment pending appeal.
On October 3, 2005, this Court granted in part and denied in part CWS’s motion to enjoin enforcement of the Act pending appeal. We enjoined enforcement of the Single-Petition Rule, but in all other respects, we denied the motion.

. Justice Thomas’s dissent in Stenberg v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), takes to task the Stenberg majority for not applying Casey’s large-fraction test and implicitly argues that the Court has abandoned the large-fraction test. Id. at 1019-20, 120 S.Ct. 2597 (Thomas, J., dissenting). Cf. Nat’l Abortion Fed’n v. Gonzales, 437 F.3d 278, 294 (2d Cir.2006) (Walker, Jr., C.J., concurring) (”[T]he Supreme Court appears to have adopted the large fraction’ standard (perhaps modified by Stenberg to mean a 'not-so-large fraction’ standard) for those who seek to challenge an abortion regulation as facially unconstitutional.”). However, Justice Thomas’s criticism is misplaced. The holding in Stenberg relating to whether the abortion restriction before the Court was an undue burden hinged entirely on statutory interpretation. Stenberg, 530 U.S. at 938, 120 S.Ct. 2597; see also id. at 938-46, 120 S.Ct. 2597. In Stenberg, the state of Nebraska acknowledged that the statute in question placed an undue burden on a woman’s right to an abortion if it was interpreted in a certain way — the way the Supreme Court eventu *368 ally interpreted it. Id. Because the state conceded that the statute was an undue burden if interpreted a certain way, the Court did not need to undertake the large-fraction analysis. See Planned Parenthood of Idaho, Inc. v. Was-den, 376 F.3d 908, 921 n. 10 (9th Cir.2004) ("The abortion-specific large fraction’ standard is part and parcel of the undue burden analysis.”). Finally, the Stenberg Court affirmed the Eighth Circuit’s decision in toto, Stenberg, 530 U.S. at 946, 120 S.Ct. 2597, which itself used Casey’s large-fraction test, see Carhart v. Stenberg, 192 F.3d 1142, 1149 (8th Cir.1999); see also id. at 1151 (Because ”[a]n abortion regulation that inhibits the vast majority of second trimester abortions would clearly have the effect of placing a substantial obstacle in the path of a woman seeking a pre-viability abortion” and the restriction here "prohibit[s] the most common procedure for second-trimester abortions,” it thereby causes "an undue burden on a woman’s right to choose to have an abortion.” (quotation omitted)).

. Interestingly, even the Fifth Circuit's cases are inconsistent on this issue. Compare Sojourner T. v. Edwards, 974 F.2d 27, 30 (5th Cir.1992) (applying Casey’s undue burden test without reference to Salerno), with Barnes, 970 F.2d at 14 & n. 2 (5th Cir. 1992) (per curiam) (applying Salerno to a facial attack on an abortion regulation).

. It is likewise clear from the record that most judicial bypass petitions are filed in the first trimester of a minor’s pregnancy and that fetal anomalies are usually not discoverable or diagnosed until the second trimester.